UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

UNITED STATES OF AMERICA

v.                                              CRIMINAL ACTION NO. 5:23-cr-00145

RICHARD SHAWN OWENS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending are the Government's motions *in limine* Regarding Admissibility of Defendant's Cocaine Use While With the Victim [ECF 161], To Preclude Defendant's Introduction of his Own Statement to Law Enforcement [ECF 162], To Preclude Introduction of Additional Messages with Other Women [ECF 163], Regarding Details of Sexual Activity [ECF 164], Regarding Admissibility of Defendant's Prior Convictions [ECF 165], Regarding Admissibility of Government's Exhibits 4A and 4B [ECF 166], and Mr. Owens' Consolidated Motion *in Limine* and Brief on Witness Admissibility [ECF 168], all filed September 7, 2025. The parties responded on September 14, 2025 [ECF 169–175] and replied on September 21, 2025 [ECF 177, 178]. Also pending is Mr. Owens' Motion to Seal [ECF 176]. The matters are ready for adjudication.

**I.**

Mr. Owens is charged in a two-count indictment. Count One alleges child sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c). Count Two charges transporting a minor with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2 and 2423(a). The grand jury alleges Mr. Owens, (1) after having had a reasonable opportunity

to observe Minor Victim 1, trafficked and caused her to engage in a commercial sexual act, and (2) transported her from Charlottesville, Virginia, to Lewisburg, West Virginia, intending to engage in sexual activity for which a person could be charged with a criminal offense.

## II.

Evidentiary rulings fall within the Court's broad discretion. *See United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). A motion in limine allows the Court to rule on the admissibility of anticipated evidence prior to trial. *See Luce v. United States*, 469 U.S. 38, 40 n.2, 41 n.4 (1984). "A motion in limine to exclude evidence should be granted only when the evidence is clearly inadmissible on all potential grounds." *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017) (cleaned up).

## III.

### A.  *Motion in Limine Regarding Admissibility of Evidence of Defendant's Cocaine Use While with the Victim [ECF 161]*

The Government asserts Mr. Owens' "cocaine use during the time period when he was with the victim . . . is admissible" because it is (1) intrinsic to the offenses charged, and (2) has independent relevance. [ECF 161 at 1–2]. The Government notes evidence of cocaine use is intrinsic because "'it involves the same series of transactions as the charged offense[ ] or . . . is necessary to complete the story.'" [*Id.* at 1 (quoting *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020))]. The Government further argues evidence of Mr. Owens' cocaine use has independent relevance for two reasons: (1) "the interactions between Defendant and the victim bear on whether he was interested in a romantic, rather than transactional, relationship with her," and (2) in the event Mr. Owens challenges her credibility, the evidence serves to corroborate "many of [Minor

Victim 1's] statements about what happened the night she went to his house—including that he offered cocaine to her and the other girls and had her hold it for him while he used it." [*Id.* at 2].

Mr. Owens responds the "evidence presents a substantial risk of unfair prejudice under Rule 403" because it "risks shifting the jury's focus from the actual elements of the offenses to moral condemnation of Mr. Owens as a person struggling with addiction." [ECF 174 at 1–2]. Mr. Owens further disputes the use of the evidence to "suggest that [Mr. Owens] was morally corrupt and more likely to engage in prostitution." [*Id.* at 1].

In reply, the Government further urges the relevance of the evidence: "[t]hat [Mr. Owens] would openly use an illegal drug in front of the victim only the second time he met her in person makes it less likely that he wanted to impress her because he perceived her as a mother figure for his children and more likely that he did not care what she thought of him because he viewed their interaction as a transaction." [ECF 177 at 2].

*Federal Rule of Evidence* 404(b) prohibits admitting evidence of another "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "Such propensity evidence is excluded because it might overpersuade a jury and cause them to prejudge one with a bad general record." *United States v. Brizuela*, 962 F.3d 784, 793 (4th Cir. 2020) (cleaned up). "But the Rule allows the admission of evidence of other acts or crimes if used to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Brizuela*, 962 F.3d at 793 (quoting Fed. R. Evid. 404(b)(2)). "Put differently, evidence is intrinsic when it 'is inextricably intertwined with the evidence regarding the charged offense [because] it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted[ ] or

serves to complete the story of the crime on trial.'" *United States v. Chaudhri*, 134 F.4th 166, 182–83 (4th Cir. 2025) (quoting *United States v. Hoover*, 95 F.4th 763, 770 (4th Cir. 2024)). But "[f]or evidence . . . to be admissible to complete the story of a charged offense, 'the evidence must be probative of an integral component of the crime on trial or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself.'" *Id.* (quoting *Brizuela*, 962 F.3d at 795). "[T]here must be a clear link or nexus between the evidence and the story of the charged offense, and the purpose for which the evidence is offered [must] actually [be] essential. Otherwise, the complete the story doctrine might be used to disguise the type of propensity evidence that Rule 404(b) is meant to exclude." *Id.* (cleaned up).

Inasmuch as the Government does not intend to adduce evidence of Mr. Owens' cocaine use while with the victim to prove his character, but, rather, to (1) complete the narrative of the night in question, (2) further its theory of the case, and, (3) if necessary, rehabilitate Minor Victim 1's credibility, Rule 404(b) is no bar to its introduction. Moreover, were it otherwise, the evidence would nevertheless be admissible to "'complete the story of the crime on trial.'" *Chaudhri*, 134 F.4th at 183 (quoting *Hoover*, 95 F.4th at 770). Mr. Owens has made clear that he intends to present evidence to the jury that his interaction with Minor Victim 1 resulted from his efforts to secure a wife and mother figure for his son. Accordingly, evidence of Mr. Owens' cocaine use during his interactions with her is intrinsic because it "provide[s] information without which the factfinder would have an incomplete or inaccurate view of other evidence . . . ." *Id.* (citation and internal quotation marks omitted). Furthermore, a nexus plainly exists between the contested evidence and the story of the charged offense as portrayed by both Mr. Owens and the Government.

In analyzing unfair prejudice pursuant to Rule 403, the Court agrees with Mr.

Owens that it would be improper for the Government to "present evidence of his cocaine use . . . to suggest [he] was morally corrupt and, therefore, more likely to engage in prostitution." [ECF 174 at 1]. The Government, however, disavows any such intention and, based upon the foregoing discussion, its contrary intentions are apparent. As our Court of Appeals has observed, "'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).

Accordingly, the Court **GRANTS** the Government's Motion *in Limine* Regarding Admissibility of Defendant's Cocaine Use While with the Victim. [**ECF 161**].

## B.     *Motion in Limine to Preclude Defendant's Introduction of his Own Statements to Law Enforcement [ECF 162]*

### 1. The Parties' Contentions

The Government asserts Mr. Owens may not introduce portions of his own statement to law enforcement. It contends no additional statements are necessary inasmuch as the video clips Mr. Owens desires to offer[1] -- M, N, and O -- are not misleading. [ECF 162 at 6]. The Government further asserts Mr. Owens seeks to impermissibly "introduce portions of his own statements to 'provide[ ] a counter-balance to the [G]overnment's inculpatory evidence,'" [*Id.* at 6–7 (quoting *United States v. Burks*, 746 F. App'x 191, 201 (4th Cir. 2018))], and as "'self-serving, exculpatory statements made by a party which are being sought for admission by that same party.'" [*Id.* at 4 (quoting *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996))]. It emphasizes Mr.

---

[1] Mr. Owens initially objected to Clip K as misleading, but now focuses his arguments on the Government's proffered clips M, N, and O. Clip K is thus omitted from the discussion.

Owens may not "introduce the additional portions of his statement in order to present his theory of the defense and provide explanatory context for the clips presented" or "improperly place his denials in front of the jury without having to take the stand himself." [*Id.* at 6–8]. To permit as much, the Government contends, would "end-run" the hearsay prohibition. [*Id.* at 8].

Mr. Owens responds the selectively edited clips advanced by the Government are a misleading effort to provide the jury a "one-sided version" of whether Mr. Owens stated he paid Minor Victim 1 $100 for sex or offered her $4,000 for sex. [*See* ECF 155 at 6]. Mr. Owens contends his proposed additional portions are necessary to "prevent the Government from . . . manufactur[ing] an inculpatory 'confession' that never existed." [ECF 174 at 4–5]. Mr. Owens further asserts allowing the clips "would force [him] to testify . . . when he has an absolute constitutional right to remain silent." [*Id.* at 9]. Nevertheless, Mr. Owens asserts even if he did testify, "[t]he damage will have been done," which is why "Rule 106 . . . [allows for] [c]ontext . . . . at the time of introduction (or on cross-examination) so that the jury evaluates the statement fairly." [*Id.* at 9]. Mr. Owens, therefore, argues in favor of his ability to admit specific additional portions to counterbalance the Government's clips, including 55:6–56:19 and 56:24–57:2 (his proposed additions to Clip O); 146:6–147:24 (his proposed additions to Clip N); and 66:18–22, 134:14–136:14, and 28:13–29:2 (his proposed additions to Clip M). Mr. Owens urges these clips "be played contemporaneously with the Government's designations or entered through cross-examination" because they "'clarify or explain the part[s] already received.'" [ECF 169 at 4, 10 (quoting *Lentz*, 524 F.3d at 526)].

The Government replies that "[n]one of the clips risk misleading the jury into believing that Defendant stated during the interview that he paid the victim for sex." [ECF 177 at 3]. Rather, "[t]he clips address basic facts that are not in dispute: [Mr. Owens] had consensual sex

6

with [Minor Victim 1], [he] gave her $100 in cash when he dropped [her] off in Virginia, and [he] had $4,000 with him when he first met [her]." [ECF 177 at 3]. The Government highlights "[j]ust because [Mr. Owen]'s admissions . . . support the theory of the case advanced by the United States does not mean that those statements suggest that [he] said something he did not say." [*Id.*]. Finally, the Government asserts "precluding [Mr. Owens] from introducing clips from his interview with law enforcement is not equivalent to preventing him from putting on a defense. [He] is free to [testify]. . . . But he cannot use his own out-of-court statements as a substitute for his testimony and thereby escape cross-examination." [*Id.* at 4–5].

## 2. The Statements

Government's Clip[2] M:

> [MR.] OWENS: Cause I gave her -- I gave her a hundred bucks when I dropped her off. And I would have probably given her 500 or so, but I had spent $400 on the damned Uber just to get her to my house.

[66:14–66:18].

Mr. Owens' Requested Additions:

> [MR.] OWENS: And I told her that. I was like, you know, [w]e hang out for a while, you know. You can -- I'll take better care of you. But here's a hundred bucks in case you want to go buy a dress or something, or want to go out to eat with your friends, whatever.

[66:18–22].

> [MR.] OWENS: Yeah. Well, she -- I don't know what she might have told you all, but she said to me many times -- and we said to each other -- this ain't about the money. She said it over and over again, This is not about the money, I really like you.
>
> TFO KEVIN RICHARDS: All right. But there was an agreement --

---

[2] As explained by the Government, "[t]he clips are identified by the letter used to identify them on the exhibit disk." [ECF 162 at 2].

[MR.] OWENS:  No, we never -- we never made an agreement for any exchange of money.

TFO . . . RICHARDS:  Okay.

[MR.] OWENS:  No, sir.  Not like talked -- discussed between us. Like, [h]ey, you're going to come over and I'm going to give you this amount of money.  No. Never.  I told her she would be able to make -- like the way that I would want to give her money is by her helping me to be able to make money.  You know?  While I'm playing poker, you're helping me out with my son and stuff, you know. Like, that's where -- that's where you get any money out of me come into play.  We never had like a formal discussion or agreement of we're going to -- you're going to come over and have sex and I'm going to pay you. That was not part of the game at all. That's why I told her, [n]o, I don't want to get a hotel room -- because if that was the case, I would have just did it when she said, uh -- what did she say on that one part?  She was like, [w]hy don't you just get a room here so I can please you and make it up to you, or something like that.  Get a room and wait for me so I can come take care of you, or something along those lines.  And I was like, [n]o, that's not what I want.  That's not what I am looking for.

TFO . . . RICHARDS:  Okay.

[MR.] OWENS:  So if it was just about money for sex, that's what I -- I wouldn't have done that.  I would have just [got] a room and had sex with the girl and then go home. That's not what I was looking for. That's why I said, no, to that.

TFO . . . RICHARDS:  Okay.

[MR.] OWENS:  I have -- I think that part was even in text message, I thought. Where I said, [n]o, I don't want to get a hotel room. I'm not just here to get a hotel room and have sex. That's not what I want.

TFO . . . RICHARDS: Yeah, she had mentioned also that you were interested in her meeting your kid, and --

[MR.] OWENS:  Yeah.

TFO . . . RICHARDS: She mentioned that, too.

[MR.] OWENS:  Yeah. I wanted to start -- I wanted to find a girlfriend, man.  I thought I -- she led me to believe that everything about this was going to be leading to a legitimate type of relationship.

[134:14–136:14].

Special Agent KARSHENAS: Okay. Tell me about that. How did -- what was the

8

arrangement?  What did you guys discuss?

[MR.] OWENS:  [Unintelligible word(s)] and it wasn't supposed to be nothing to do with no kind of sex or nothing.  I just wanted to, you know, meet the girl, hang out, take her on a date.  You know, maybe let me take her shopping or something. Because it's a website for gold diggers pretty much [Unintelligible word(s)]

[SA] KARSHENAS:  Website for gold diggers?

[MR.] OWENS:  Which, you know --

[SA] KARSHENAS:  That's -- that's a rough arrangement though for most guys.

[MR.] OWENS:  Yes.

[28:13–29:2].

Government's Clip N:

TFO . . . RICHARDS: So how did you pay her the $100?

[MR.] OWENS: I just gave her cash, because it was all I had left in my wallet at the particular moment.

TFO . . . RICHARDS: Yeah. And where were you when you gave her the money?

[MR.] OWENS: We were -- it was in the truck right before I dropped, when I dropped them off. Right before she got out. Like, they never, we never discussed any exchange of money. And so I thought I was just being nice. And, like, [h]ere, you know, here's a hundred bucks for whatever you may need over the next day or two until I see you.

[146:6–146:18].

Mr. Owens' Requested Addition:

TFO . . . RICHARDS:  Yeah, she felt like -- she felt you all had discussed it and agreed on $4,000?

[MR.] OWENS:  Yeah, no.

TFO . . . RICHARDS:  So --

[MR.] OWENS:  That was never the case.

TFO . . . RICHARDS:  Not the case?

9

[MR.] OWENS:  Not the case.  The only time I said the words $4,000 was when I was pissed off and I was trying to -- I was trying to make her upset at what she could have potentially missed out on with me taking her shopping and stuff.  And, you know, how much money -- you know, I got -- I wasn't -- but, no, there was never any kind of -- what's that word -- talking -- like, we never talked about, Hey, I'll give you $4,000.  I wouldn't pay $4,000 just to spend the night with one person.  No way.

TFO . . . RICHARDS:  Yeah, okay.

[MR.] OWENS:  No.  And the only reason I said it that much is like I told you, I was going to take her shopping.  I might have spent a grand, you know, taking her shopping, buying stuff.  Buying an outfit and some shoes and go out to dinner and stuff.  Maybe --

TFO . . . RICHARDS:  Maybe a dress that's not ripped?

[MR.] OWENS:  Yeah, stuff like that. there was never any -- any agreement of --

TFO . . . RICHARDS:  Okay.

[MR.] OWENS:  Hey, you're going to come spend the night and I'm going to give you this much money.  And then like I said over and over again, she kept on talking she kept on saying, This ain't about money, I really like you.

[146:6–147:24]

Government's Clip O:

[SA] KARSHENAS:  So you're on Seeking, you reached out, you started talking, you start texting, and you meet up in person. So again, going back to that question up to the first date, there was no text messages or conversations about money? Is that --

[MR.] OWENS:  Not really, no.

[SA] KARSHENAS:  Okay. Other than when you're saying about like

[MR.] OWENS:  The only thing that is [sic] said is when I was pissed off because she stood me up, and I was driving home or whatever. You know, like I said, I was going to take the girl shopping. And so I made mention of, like, this is -- I was like, I just got like four grand out of the bank, too. Which I won't gonna spend all that on her. But I was like, I just got this money out of the bank for no reason, now. I just drove all the way over here for no reason. I was going to take you shopping. We were going to have a good time. Now I'm going home, you know. You f-- you

pissed me off.

TFO . . . RICHARDS: How much money did you bring with you?

[MR.] OWENS: I had like four grand. But that was a little bit of bullshit. I wasn't going to --

[SA] KARSHENAS: That's why I'm asking --

[MR.] OWENS: It wasn't for her by any means.

[SA] KARSHENAS: That's why I'm asking you, you actually did have four grand or you were just telling her you had four grand?

[MR.] OWENS: Oh, no, I actually did have it.

[57:3–58:9].

Mr. Owens' Requested Additions:

[SA] KARSHENAS: Let's talk about when you guys were meeting up. When you guys were talking.

[MR.] OWENS: There was no predetermined like, there was no: You're going to pay me this much money, or whatever.

[SA] KARSHENAS:  Was there -- was there any discussion about money?

[MR.] OWENS:  No.

[SA] KARSHENAS: Exchange of money?

[MR.] OWENS:  No.

[SA] KARSHENAS:  Okay. Was there any discussion about exchange of money, either via text message -- or, I'm sorry, via messaging on Seeking or via text messaging on the phones?

[MR.] OWENS:  No, not really exchange of money. But we did talk about how I told her -- you know -- if any wife of mine would -- would help me, you know, take care of my kids while I'm playing poker and stuff, and in return, I would, you know, any wife of mine would have a lucrative, you know, you'd make money.  I got a lot of money.  So if I were to wife you up, you would get a share of that money, basically, is how I was putting it to her. And, you know, during our first date, I was like, I was going to take you out on a date, or I'll take you shopping a little bit, too. But --

[SA] KARSHENAS:  I just want to clarify some things.  The first date, you're talking about when you guys first met at Panera?

[MR.] OWENS:  Yes.

[SA] KARSHENAS: That's what you're calling
the first date?

[MR.] OWENS:  Yeah.  Yeah.  The plan was -- well, I mean, that was the only date, really.  But the plan was, I was going to take her to get something to eat, and then take her to do a little shopping.  And if she wanted to come back to my place and hang out for a day or two, that would be cool.

[SA] KARSHENAS:  Okay.

[55:6–56:19].

[SA] KARSHENAS:  So I'm just trying to track the conversation.  So --

[MR.] OWENS:  Yeah.

[56:24–57:2].

### 3. Governing Standard and Analysis

"Rule 801(d)(2)(A) provides that a statement is not hearsay if 'the statement is offered against an opposing party' and 'was made by [that] party in an individual or representative capacity.'" *United States v. Benson*, 957 F.3d 218, 229 (4th Cir. 2020) (quoting Fed. R. Evid. 801(d)(2)(A)). "Thus, a defendant's own statements constitute admissions by a party-opponent and are admissible pursuant to this Rule." *United States v. Wills*, 346 F.3d 476, 489 (4th Cir. 2003) (cleaned up).

Rule 106 states: "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106. Our Court of Appeals has rationalized the Rule as follows: "[t]he

purpose of Rule 106 is 'to prevent a party from misleading the jury by allowing into the record relevant portions of a writing or recorded statement which clarify or explain the part already received.' 'The rule is protective, merely. It goes only so far as is necessary to shield a party from adverse inferences, and only allows an explanation or rebuttal of the evidence received.'" *United States v. Moussaoui*, 382 F.3d 453, 481 (4th Cir. 2004) (first quoting *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996); and then quoting *United States v. Corrigan*, 168 F.2d 641, 645 (2d Cir. 1948) (cleaned up)). "The Rule . . . functions as a defensive shield against potentially misleading evidence proffered by an opposing party." *Id.* (quoting *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001)). This so-called "rule of completeness," however, "is not to be used . . . as a means of seeking the admission of . . . statements that neither explain nor clarify" the statement offered by the introducing party. *Id.* at 482. The Notes of Advisory Committee on Proposed Rules state the two considerations upon which the Rule is based, including "the misleading impression created by taking matters out of context . . . [and] the inadequacy of repair work when delayed to a point later in the trial." Fed. R. Evid. 106 Notes of Advisory Committee on Proposed Rules (citation omitted).

Applying these principles counsels in favor of allowing Mr. Owens to introduce and refer to certain of his statements pursuant to Rule 106, but only to the extent necessary to explain, clarify, or avoid the potential to mislead. For its part, the Government maintains that it intends to introduce clips that could be construed as beneficial statements of the type Mr. Owens seeks leave to introduce pursuant to Rule 106. [*See* ECF 162 at 7–8 (explaining that Clips N and O contain language construed by the Government to be "self-serving denials" and "self-serving explanations")]. The Government thus contends its clips are not misleading, so Rule 106 is inapplicable. But Rule 106 does not require a defendant to prove a statement is misleading. The

Rule applies equally to *misleading* evidence, "*potentially misleading* evidence," and incomplete evidence. *Moussaoui*, 382 F.3d at 481 (citation omitted) (emphasis added). Therefore, it is enough for Clips M, N, and O to be potentially misleading or, at the very least, incomplete.

The Court has limited Mr. Owens' requested statements to address his concerns regarding completeness as well as the Government's concern that Mr. Owens intends to "use his own out-of-court statements as a substitute for his testimony and thereby escape cross-examination." [ECF 177 at 5]. Further, even if Mr. Owens does testify, the Court agrees with Mr. Owens that, by that point, the potentially misleading evidence might well be beyond repair. Whether the testimony is misleading was concededly a principle consideration for the adoption of the rule, *see* Fed. R. Evid. 106 Notes of Advisory Committee on Proposed Rules (citing as a consideration "the misleading impression created by taking matters out of context"), but the other principle consideration for the adoption of the rule was "the inadequacy of repair work when delayed to a point later in the trial." *Id.*

In light of the foregoing, Mr. Owens may adduce only the following additional portions that "in fairness ought to be considered at the same time," Fed. R. Evid. 106, to "explain []or clarify" the statements offered by the Government. *Moussaoui*, 382 F.3d at 482.

To "complete" the Government's Clip M:

[MR.] OWENS: And I told her that. I was like, you know, We hang out for a while, you know. You can -- I'll take better care of you. But here's a hundred bucks in case you want to go buy a dress or something, or want to go out to eat with your friends, whatever.

[66:18–66:22].

TFO . . . RICHARDS: All right. But there was an agreement --

[MR.] OWENS: No, we never -- we never made an agreement for any exchange of money.

14

TFO . . . RICHARDS:  Okay.

[134:19–134:23].

[SA] KARSHENAS:  Okay.   Tell me about that. How did -- what was the arrangement?  What did you guys discuss?

[MR.] OWENS: [Unintelligible word(s)] and it wasn't supposed to be nothing to do with no kind of sex or nothing.  I just wanted to, you know, meet the girl, hang out, take her on a date.  You know, maybe let me take her shopping or something.  Because it's a website for gold diggers pretty much [Unintelligible word(s)]

[28:13–28:21].

To "complete" the Government's Clip N:

TFO . . . RICHARDS:  Yeah, she felt like -- she felt you all had discussed it and agreed on $4,000?

[MR.] OWENS:  Yeah, no.

TFO . . . RICHARDS:  So --

[MR.] OWENS:  That was never the case.

TFO . . . RICHARDS:  Not the case?

[MR.] OWENS:  Not the case.  The only time I said the words $4,000 was when I was pissed off and I was trying to -- I was trying to make her upset at what she could have potentially missed out on with me taking her shopping and stuff.  And, you know, how much money -- you know, I got -- I wasn't -- but, no, there was never any kind of -- what's that word -- talking -- like, we never talked about, Hey, I'll give you $4,000.  I wouldn't pay $4,000 just to spend the night with one person.  No way.

[146:19–147:9].

[MR.] OWENS:  . . . [T]here was never any -- any agreement of --

TFO . . . RICHARDS:  Okay.

[MR.] OWENS:  Hey, you're going to come spend the night and I'm going to give you this much money.

[147:18–147:21].

To "complete" the Government's Clip O:

[SA] KARSHENAS: Let's talk about when you guys were meeting up.  When you guys were talking.

[MR.] OWENS: There was no predetermined like, there was no:  You're going to pay me this much money, or whatever.

[SA] KARSHENAS:  Was there -- was there any discussion about money?

[MR.] OWENS:  No.

[SA] KARSHENAS: Exchange of money?

[MR.] OWENS:  No.

[55:6–55:15].

Based upon the foregoing, the Court **DENIES AS MOULDED** the Government's Motion *in Limine* to Preclude Defendant's Introduction of his Own Statement to Law Enforcement. [**ECF 162**].

### C.    *Motion in Limine to Preclude Introduction of Additional Messages with Other Women [ECF 163]*

#### 1. The Parties' Contentions

The Government asserts the messages it seeks to introduce are not misleading, so Rule 106 may not be used to introduce the remainder of the messages. [ECF 163 at 6]. The Government contends Mr. Owens' attempt to introduce the additional messages is "an unambiguous attempt to do exactly what Rule 106 does not permit — the introduction of additional portions of a conversation simply because it would provide a beneficial counter-balance to the inculpatory statements introduced by the United States." [*Id.* at 6.]. Moreover, the Government contends the messages are irrelevant, hearsay not covered by an exception, and otherwise inadmissible pursuant to Rule 403 because "the probative value of his statements to other women

about matters other than commercial sex is so minimal as to be substantially outweighed by the risks of confusing the issues, misleading the jury, and wasting time." [*Id.* at 6–7].

Mr. Owens responds Rule 106 requires the admission of additional messages with women because "[t]he additional communications are necessary 'in fairness' to ensure the jury understands the full context of Mr. Owens' interactions." [*Id.* at 3]. Mr. Owens responds the messages are relevant and not hearsay because he offers them not for their truth, but to show that "when Mr. Owens intended sex-for-money arrangements, he spoke and acted in a certain way" as compared to "when [he was] dealing with" Minor Victim 1. [ECF 171 at 3]. Finally, Mr. Owens urges Rule 403 weighs in favor of admissibility inasmuch as "[i]f the jury is shown only the Government's cherry-picked excerpts, which are conversations involving sexual negotiations and monetary exchanges, without the full contrasting context, the jury will be left with the false impression that all of Mr. Owens' communications with women from Seeking.com were of this nature." [*Id.* at 4]. Specifically, Mr. Owens urges the introduction of portions of his communications with seven women, [*see id.* at 6–11], in order to prove the nature of his conversations with those women illustrate his "intended sex-for-money-arrangements" with those women, [ECF 171 at 3], and, subsequently, to prove his communications with Minor Victim 1 were different in contrast.

### 2. Governing Standard and Analysis

#### a. Admissibility Under Rule 106

As explained above, "[t]he purpose of Rule 106 is 'to prevent a party from misleading the jury by allowing into the record relevant portions of a writing or recorded statement which clarify or explain the part already received.' 'The rule is protective, merely. It goes only so

far as is necessary to shield a party from adverse inferences[] and only allows an explanation or rebuttal of the evidence received.'" *Moussaoui*, 382 F.3d at 481 (first quoting *Wilkerson*, 84 F.3d at 696; and then quoting *Corrigan*, 168 F.2d at 645 (cleaned up)). "[T]he rule of completeness is not to be used . . . as a means of seeking the admission of . . . statements that neither explain nor clarify" the statement offered by the introducing party. *Id.* at 482.

The messages with women identified by the Government are not misleading or even potentially misleading. Instead, they "capture relevant statements that [Mr. Owens] made with multiple women regarding paying them for sex." [ECF 163 at 5]. Moreover, the messages that Mr. Owens seeks to introduce fail to explain or clarify the portions the Government seeks to admit. Rather, Mr. Owens transparently seeks admission through Rule 106 of additional portions of his messages with women to prove his intentions with them and, thereby, support his case regarding his intent with Minor Victim 1. Therefore, Rule 106 is inapplicable and cannot provide a basis for admitting the communications.

### b. Whether Otherwise Admissible

Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement," and is generally inadmissible. Fed. R. Evid. 801(c), 802. "If a statement is offered for any other reason, it is not hearsay and may not be excluded on that basis." *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) (citing Fed. R. Evid. 802).

Inasmuch as Mr. Owens seeks to introduce the messages to prove he meant what he said to the women (*i.e.*, that he was seeking either a life partner, a pay-per-meet relationship, or a live-in nanny), [*see* ECF 171 at 6–11], the communications are inadmissible hearsay. Mr. Owens contends he desires to introduce the messages not for their truth -- but to demonstrate the "sharp contrast between [his] explicit sexual and transactional communications with other women, on the

one hand, and his communications with [Minor Victim 1] on the other." [ECF 171 at 2]. The underlying reason why Mr. Owens wishes to highlight the "sharp contrast" is to prove that, while he intended "sex-for-money-arrangements" with the other women, he did not intend the same arrangement with Minor Victim 1. [ECF 171 at 3]. Proving he intended "sex-for-money-arrangements" means that he intends to prove the truth of the matters asserted in the messages. [*Id.*]. Consequently, the communications are inadmissible hearsay unless the Rule 803(3) exception applies.

Rule 803 enumerates twenty-three distinct hearsay exceptions, "regardless of whether the declarant is available as a witness." Fed. R. Evid. 803. Rule 803(3) provides an exception for hearsay statements when the statement represents "the declarant's then-existing state of mind (such as motive, intent, or plan) . . . , but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). "[T]he . . . point of . . . Rule . . . 803 is to permit certain out-of-court statements to be offered for their truth value." *Gallagher*, 90 F.4th at 197.

In an unpublished opinion, our Court of Appeals enumerated the "threshold requirements" of the rule as follows: "(1) the statement must be contemporaneous with the mental state sought to be proven; (2) there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case." *United States v. Srivastava*, 411 F. App'x 671, 684 (4th Cir. 2011) (first citing *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992), and then citing *United States v. Faust*, 850 F.2d 575, 585 (9th Cir. 1988)); *see also Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 570 (D. Md. 2007) (citing [1] Jack B. Weinstein & Margaret A. Berger *Weinstein's Federal Evidence* § 803.05[2][a] (Joseph M. Mclaughlin ed., Matthew Bender 2d ed.

1997) (acknowledging (1) contemporaneousness with the mental state being proven; (2) an absence of suspicious circumstances that would evidence a motive for fabrication or misrepresentation of the declarant's state of mind; and (3) relevance of the declarant's state of mind as "the foundation for proving an exception under Rule 803(3)")). *But see Gallagher*, 90 F.4th at 196 (citing *Srivastava*, 411 F. App'x at 684) (acknowledging disagreement among courts regarding whether the second prong would render statements inadmissible or merely go to the weight the statements should be given by the jury). *See also* 2 Barbara E. Bergman, Nancy Hollander & Theresa M. Duncan *Wharton's Criminal Evidence* § 6:29 (15th ed.) ("While problems with sincerity or ambiguity may still remain, on balance, such statements are usually admitted and the appropriate weight to be given them is left to the jury.").

Mr. Owens wishes to introduce the messages as circumstantial evidence of his state of mind when communicating with the other women. He hopes that evidence will thereby serve him circumstantially as to his state of mind regarding the interactions with Minor Victim 1. His ultimate hope is to supply the jury with evidence probative of his lack of intent to engage in commercial sex or prostitution.[3]

Certain of Mr. Owens' excerpted statements in his messages to women are, therefore, relevant to an issue in the case. The statements are also contemporaneous with his mental state being proven -- at least to the extent that he will use his messages as evidence of his state of mind while communicating with the other women. Nor are there any suspicious circumstances evidencing a motive for fabrication. It is apparent, however, Mr. Owens may not use messages the

---

[3] Mr. Owens also wishes to introduce statements to women reflecting that, in addition to "sex-for-money-arrangements," he was also seeking either a life partner, a mother for his son, a live-in nanny, or an accountant/business partner. The statements are not probative of his intent or lack of intent to engage in commercial sex or prostitution with Minor Victim 1.

women sent to him as evidence of his then-existing state of mind. Only his own statements would be relevant to his state of mind. Pursuant to Rule 803(3), only the following additional portions of his messages would be admissible to illustrate his intent to engage in "sex-for-money-arrangements" with the other women in order to serve as circumstantial evidence for him to illustrate by contrast that he did not intend the same arrangement with Minor Victim 1. [ECF 171 at 3]. To "Nadia:" "Maybe if you drove and didn't have to Uber lol . . . I'd offer $600-800 just for . . . . . option 3 Jsyk if that doesn't make you wanna block me I hope. Even up to $1k potentially depending on what all we did tbh Buttt a extra G for the Uber is prolly too much to justify," [ECF 171 at 7 (quoting ECF 176 Ex. 3 at 86)]; to "Hailey" "You already deleted your acct I don't trust this no deal," [ECF 171 at 8 (quoting ECF 176 Ex. 3 at 297)]; and to "Magee"

> I would be looking for someone who would want to live here so not having bills to pay would sort of be part of the incentive and I'd pay phone bills and everything. . . . And on this note now I may be interested in teasing myself with a little naughty videos or pics if you want . . .  depending on content of them and price lol.

[ECF 171 at 9 (quoting ECF 176 Ex. 3 at 189–192)].

Nonetheless, even admissible evidence may be excluded if its "probative value is substantially outweighed" by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or unnecessarily presenting cumulative evidence. Fed. R. Evid. 403. The Government asserts the probative value of the statements "is so minimal as to be substantially outweighed by the risks of confusing the issues, misleading the jury, and wasting time." [ECF 163 at 6–7]. Although Mr. Owens also ostensibly makes a Rule 403 argument, it is instead an appeal to fairness, which is immaterial when considering Rule 403. [*See* ECF 171 at 4 (arguing that it would be improper for "the jury [to] be left with the false impression that all of Mr. Owens' communications with women from Seeking.com were of [a commercial] nature.")].

In analyzing the probative value of Mr. Owens' messages to other women, and

assuming a properly laid foundation, the Court declines to exclude the concededly relevant and otherwise admissible evidence outlined above because "'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *Lentz*, 524 F.3d at 525 (quoting *Aramony*, 88 F.3d at 1378). The messages are consistent with the portions the Government intends to introduce, so they are not unfairly prejudicial to the Government. After Mr. Owens introduces the evidence, if the Government has concerns regarding confusion or misleading the jury, the Government may request a limiting instruction pursuant to Rule 105.

The Court **DENIES AS MOULDED** the Government's Motion *in Limine* to Preclude Introduction of Additional Messages with Other Women. [**ECF 163**].

### D.    *Motion in Limine Regarding Admissibility of Details of Sexual Activity [ECF 164]*

The Government asserts it "has no intention of introducing any evidence or testimony of the details of any sex acts between the victim and defendant[, but] . . . will simply elicit testimony (and play a clip from [Mr. Owens'] statement) stating the undisputed fact that they had sex."  [ECF 164]. Mr. Owens responds that he objects not to admission of the fact of intercourse, but, rather, to any testimony or evidence that might impress upon "the jury that the sexual intercourse between Mr. Owens and [Minor Victim 1] was non-consensual," including that she "drank alcohol, vomited, or [any suggestion] Mr. Owens . . .  spiked her drink, [because such evidence] . . . risks inviting the jury to convict based on emotion, moral condemnation, or a perceived propensity for misconduct, rather than on the legal elements of the charges . . . [and] falls squarely within Rule 403's prohibition on unfairly prejudicial evidence." [ECF 175 at 1–2]. The Government asserts (1) it intends to "present the narrative of the night . . . just as it happened," (2) "[t]here is no allegation that the sex was anything other than consensual," and (3) that "what

happened that night—including that the victim drank alcohol and vomited on Defendant's bed before they had sex—is relevant, admissible evidence that is probative of Defendant's intent . . . [because] it undermines his claims that he saw his 'date' with the victim as the beginning of a long-term relationship instead of a one-night-stand." [ECF 177 at 6].

A court can exclude otherwise relevant evidence "if its probative value is substantially outweighed" by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or unnecessarily presenting cumulative evidence. Fed. R. Evid. 403. Where the offered evidence has low probative value, it is justifiably excluded. *See United States v. Peterson*, 945 F.3d 144, 157 (4th Cir. 2019). And, as previously noted, "'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *Lentz*, 524 F.3d at 525 (quoting *Aramony*, 88 F.3d at 1378). Furthermore, as the Government notes, "'the prosecution is entitled to prove its case by evidence of its own choice,'" which certainly includes -- at a minimum -- reciting the details of how a particular event transpired, especially when the event is central to its case. [ECF 177 at 6 (quoting *Old Chief v. United States*, 519 U.S. 172, 186–87 (1997))]. In analyzing unfair prejudice, the Court agrees with the Government that, although "a jury may find the details of the offense egregious[, that fact] does not make the admission of those details unfair." [*Id.* at 7 (quoting *United States v. Miller*, 61 F.4th 426, 432 (4th Cir. 2023))].

Therefore, the Court **GRANTS** the Government's Motion *in Limine* Regarding Admissibility of Details of Sexual Activity. [**ECF 164**].

**E.    *Motion in Limine Regarding Admissibility of Defendant's Prior Convictions [ECF 165]***

The Government asserts it "does not anticipate seeking to introduce, in its case-in-chief at trial, evidence or testimony regarding either of [Mr. Owens'] prior convictions . . . [unless Mr. Owens] chooses to testify in his own defense or if he introduces character evidence about his law-abidingness." [ECF 165 at 1]. Mr. Owens responds that his prior convictions "provide no legitimate basis for impeachment of credibility [and] [t]hey are irrelevant to truthfulness, highly prejudicial, and risk tainting the jury with improper propensity reasoning." [ECF 173 at 3]. Mr. Owens concedes the convictions would be "admissible if Mr. Owens affirmatively introduces character evidence of his law-abidingness." [*Id.*].

A ruling is premature. The Court will address the motion at trial if the circumstances warrant it and a timely objection or offer is made by the proponent. Accordingly, the Court **DENIES WITHOUT PREJUDICE** the Government's Motion in Limine Regarding Admissibility of Defendant's Prior Convictions [**ECF 165**].

F.     *Motion in Limine Regarding Admissibility of Government's Exhibits 4A and 4B [ECF 166]*

### 1. The Parties' Contentions

The Court next turns to Exhibits 4A and 4B, which depict the victim. The Government asserts Exhibits 4A and 4B are relevant, probative, and necessary. It contends they are (1) relevant to prove Minor Victim 1 was underage at the time the offenses allegedly occurred, (2) "probative because they depict the victim . . . [three weeks after the] offenses allegedly occurred," and (3) "necessary to tell the 'colorful story' of the offense in this case and provide the jury with . . . 'concrete and particular' evidence." [ECF 166 at 2 (quoting *Old Chief*, 519 U.S. at 187)]. The Government further urges the exhibits are not unfairly prejudicial "simply because the

jurors might draw their own conclusions about whether the victim 'looked young' or not. Unfair prejudice 'speaks to the capacity of concededly relevant evidence to lure the factfinder into declaring guilt on a ground *different from proof specific to the offense charged*.' . . . [T]he United States must prove that the victim was a minor at the time the charged offenses allegedly occurred. In that sense, a juror's opinion that she 'looked young' goes to whether the United States has met its burden." [*Id.* at 4 (quoting *United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015))].

Mr. Owens asserts Exhibits 4A and 4B should be excluded because the photographs are not relevant or probative and would unfairly prejudice him. Mr. Owens asserts the "pictures invite a verdict based on emotion[] by making [Minor Victim 1] look especially childlike when the issue at trial is intent to engage in prostitution." [ECF 172 at 2–3]. He further notes the Government may rely on other evidence to prove Minor Victim 1's age, including "her testimony, a birth certificate, or the investigating officer's background report." [ECF 172 at 2]. Invoking fairness, he contends "exclud[ing his use of evidence] . . . of [Minor Victim 1's] appearance while allowing the prosecution to exploit" evidence of age, results in an inequitable "asymmetry [and] creates unfairness and jury confusion." [*Id.*]. If the challenged exhibits are admitted, Mr. Owens asserts fairness dictates he should be permitted to adduce evidence of his subjective belief about Minor Victim 1's age.

In reply, the Government contends it "'may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.'" [ECF 177 at 8 (quoting *Old Chief*, 592 U.S. at 188)]. Therefore, the Government urges its ability to use other evidence to establish Minor Victim 1's age "does not mean the photographs . . . must be excluded." [*Id.* at 8].

25

### 2. Governing Standard and Analysis

Pursuant to 18 U.S.C. § 1591(a)(1), (b)(2), (c) and 18 U.S.C. § 2423(a), the Government must prove the victim was a minor. *See United States v. Parks*, 849 F. App'x 400, 403 (4th Cir. 2021); *United States v. Banker*, 876 F.3d 530, 536 (4th Cir. 2017). The Government need not, however, prove Mr. Owens' knowledge of Minor Victim 1's age. Those two considerations resulted earlier in the Court precluding Mr. Owens from presenting evidence related to his knowledge of the victim's age. [*See* ECF 154 at 9]. The Court reasoned such evidence was irrelevant inasmuch as Mr. Owens' knowledge of the victim's age "neither tends to prove nor disprove an element of either charged offense," [*id.* at 2], "has minimal probative value, and poses a substantial risk of misleading the jury." [*Id.* at 9].

Exhibits 4A and 4B -- which depict Minor Victim 1 three weeks after the offenses allegedly occurred, standing next to one of the task force officers involved in the investigation of this case -- are relevant and probative evidence inasmuch as the Government intends to use the photos, along with other evidence, to establish Minor Victim 1's age. As noted, age is an element of the offense. Neither has Mr. Owens demonstrated Rule 403 bars the exhibits. That is especially the case, given "'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *Lentz*, 524 F.3d at 525 (quoting *Aramony*, 88 F.3d at 1378). In any event, unfair prejudice does not arise "simply because the jurors might draw their own conclusions about whether the victim 'looked young' or not" at the time the photographs were taken. [ECF 166 at 4].

Accordingly, the Court **GRANTS** the Government's Motion *in Limine* Regarding Admissibility of Government's Exhibits 4A and 4B. [**ECF 166**].

### G.    *Motion in Limine Regarding Admissibility of Defense Witness Testimony [ECF 168]*

### 1. The Parties' Contentions

The Court next turns to Mr. Owens' request to adduce testimony from Paul Detch, his former counsel.[4] He asserts the evidence is admissible inasmuch as it is not offered for the truth of the matter asserted. He instead proffers the testimony to "show what was on Mr. Owens' mind at the time" -- including the fact that he was focused on receiving counsel regarding Minor Victim 1's age rather than seeking legal advice regarding "prostitution or transactional sex." [ECF 168 at 4]. According to Mr. Owens, the evidence is probative of his lack of intent to engage in prostitution or commercial sex with Minor Victim 1 because he did not mention either to the attorney.

Mr. Owens analogizes to the admissibility and inherent truthfulness of statements made for medical diagnosis or treatment pursuant to Rule 804(4). He asserts the statements to his former attorney carry a "strong guarantee of trustworthiness" similar to statements made for medical diagnosis or treatment. [*Id.* at 3]. Moreover, Mr. Owens contends the probative value of the testimony is substantially outweighed by any risk of confusion or prejudice to the jury because the testimony will not include evidence of the "legality of [Mr.] Owens' conduct. Rather, the testimony will be strictly limited to what Mr. Owens disclosed during the consultation, demonstrating his focus on age and absence of any reference to prostitution. . . . [So] the testimony

---

[4] Mr. Owens also seeks an in limine ruling regarding the admissibility of testimony of three additional expected witnesses, including Mr. Owens' mother, Robin Wynn, sister, Stephanie Owens, and former partner and the mother of his son, Alexis Brown. [ECF 168 at 6–12]. The Government "does not seek to preclude their testimony . . . [but] reserves the right to object to any particular question or line of questioning at trial on relevance, hearsay, or any other permissible grounds, just as it would be entitled to do for any defense witness." [ECF 170 at 1]. Mr. Owens nevertheless requests a ruling that "the proffered testimony is admissible in principle, with the usual protections of trial objections preserved." [ECF 178 at 2]. The requested peremptory ruling is unnecessary. The Court will rule on objections to the testimony as they arise during trial.

presents no risk of usurping the Court's role in instructing on the law or of misleading the jury." [*Id.* at 4].

The Government responds the evidence is inadmissible hearsay outside the Rule 803(3) exception regarding then-existing mental, emotional, or physical conditions. [ECF 170 at 2]. Specifically, the Government responds (1) Mr. Owens' statements to Mr. Detch were not made contemporaneously with the mental state being proven, (2) circumstances indicate Mr. Owens had a motive to misrepresent his thoughts, and (3) the declarant's state of mind must be relevant to an issue in the case. [*Id.* at 2 (citing *Srivastava*, 411 F. App'x at 684 ; *Gallagher*, 90 F.4th at 196)]. The Government emphasizes Mr. Owens' statements to Mr. Detch described his state of mind days earlier and were, instead, an inadmissible memory or belief regarding Mr. Owens' intent. [*Id.* at 3 (quoting *United States v. Liu*, 654 F. App'x 149, 154 (4th Cir. 2016) ("Forward-looking statements of intent are admissible, but backward-looking statements of memory are not."))].

## 2. Governing Standard and Analysis

With reference to the standards earlier utilized, it is undisputed Mr. Owens' intent is a central issue. Accordingly, his statements are relevant. Although the evidence regarding Mr. Owens' motivations when discussing the encounter with his lawyer cuts both ways, Mr. Owens' Rule 803(3) assertion nevertheless fails. Mr. Owens' conversations with Mr. Detch occurred days after his encounter with Minor Victim 1. He would have been describing his state of mind from days prior to Mr. Detch -- as opposed to his then-existing state of mind -- which is fatal to the attempt to introduce the testimony pursuant to Rule 803(3). *See Liu*, 654 F. App'x at 154–55 ("Forward-looking statements of intent are admissible, but backward-looking statements of memory are not. . . . Any statements . . . would have described [the declarant's] state of mind hours

or days earlier, rather than a 'then-existing' state of mind.").

The Court **DENIES** Mr. Owens' Motion *in Limine* on Witness Admissibility regarding Mr. Detch. [**ECF 168**].

**IV.**

Based upon the foregoing discussion, the Court **ORDERS** as follows respecting the pending motions:

1. That the Government's Motion *in Limine* Regarding Admissibility of Defendant's Cocaine Use While with the Victim is **GRANTED** [**ECF 161**];

2. That the Government's Motion *in Limine* To Preclude Defendant's Introduction of his Own Statement to Law Enforcement is **DENIED AS MOULDED** [**ECF 162**];

3. That the Government's Motion *in Limine* to Preclude Introduction of Additional Messages with Other Women is **DENIED AS MOULDED** [**ECF 163**];

4. That the Government's Motion *in Limine* Regarding Admissibility of Details of Sexual Activity is **GRANTED** [**ECF 164**];

5. That the Government's Motion *in Limine* Regarding Admissibility of Defendant's Prior Convictions is **DENIED WITHOUT PREJUDICE** [**ECF 165**];

6. That the Government's Motion *in Limine* Regarding Admissibility of Government's Exhibits 4A and 4B is **GRANTED** [**ECF 166**];

7. That Mr. Owens' Motion *in Limine* on Witness Admissibility regarding Mr. Detch is **DENIED** [**ECF 168**].

8. That Mr. Owens' Motion to Seal Exhibit 1 to ECF 169 as well as Exhibits 1 and 2 to ECF 171 is **GRANTED** [**ECF 176**].

The Court **DIRECTS** the Clerk to transmit a copy of this written opinion and order to the Defendant and his counsel, the United States Attorney, the United States Probation Officer, and the United States Marshal Service.

ENTER: October 31, 2025

Frank W. Volk
Chief United States District Judge